# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 19, 2016 Session

## STATE OF TENNESSEE v. CHRISTOPHER MICHAEL FERRELL

### Appeal from the Criminal Court for Davidson County
### No. 2013-D-3327     Steve R. Dozier, Judge

---

### No. M2015-01011-CCA-R3-CD – Filed November 18, 2016

---

The Defendant, Christopher Michael Ferrell, was convicted by a jury of second degree murder, a Class A felony. See Tenn. Code Ann. § 39-13-210. The trial court imposed a sentence of twenty years' incarceration to be served at one hundred percent. In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his conviction, specifically arguing that he should have been acquitted for acting in self-defense or convicted instead of voluntary manslaughter; (2) that the trial court erred in denying his request for a special jury instruction regarding the State's failure to preserve evidence; (3) that the trial court committed several errors when instructing the jury on self-defense; (4) that the trial court abused its discretion in setting the length of his sentence; and (5) that he is entitled to a new trial based upon cumulative error. Following our review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

David L. Raybin (at trial and on appeal); and Benjamin Raybin (on appeal), Nashville, Tennessee, for the appellant, Christopher Michael Ferrell.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; John Wesley King and Tammy Haggard Meade, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

*I. State's Proof*

*A. The Shooting*

Eric Lee Beddingfield testified at trial that he was a "touring full-time musician" and that the victim, Wayne Mills, "was also a musician, songwriter" and "one of [his] best friends." On the night of November 22, 2013, Mr. Beddingfield and Mr. Mills attended a "big tribute show" for George Jones[1] at Bridgestone Arena in downtown Nashville. Mr. Beddingfield "was lucky enough to be playing that night," and Mr. Mills "had several friends that were [also] playing at the show." Mr. Beddingfield recalled that the arena was "pack[ed]-out" and that several famous country music performers were involved in the concert. Mr. Beddingfield testified that Mr. Mills "was with [him] back stage for" the concert. According to Mr. Beddingfield, it was "a very, very exciting night" and Mr. Mills was "[l]ike a little kid . . . just having a great time."

After the concert, Mr. Beddingfield had family, friends, and "some business partners in town that [he] took out" to entertain. Mr. Mills told Mr. Beddingfield that he was going to see fellow musician, Shooter Jennings,[2] "play at a show downtown somewhere." Between 2:00 and 2:30 a.m. on November 23, 2013, Mr. Beddingfield received a text message from the Defendant. Mr. Beddingfield explained that Mr. Mills had introduced him to the Defendant and that he had been to the Defendant's establishment, the Pit and Barrel, "several times." The text message informed Mr. Beddingfield that the Defendant had run into Mr. Mills and Mr. Jennings and that "everyone was going to meet back up" at the Pit and Barrel.

Mr. Beddingfield recalled that he, along with his wife and two of their friends, arrived at the Pit and Barrel between 2:30 and 3:00 a.m. Mr. Beddingfield testified that the Defendant, Mr. Mills, and three people that he did not know, two women and a man, were there when he arrived. According to Mr. Beddingfield, "[e]verybody was just kind of hanging around, drinking," and "kind of passing a guitar back and forth." A short

---

[1] Nicknamed "Possum" and "No-Show Jones," George Jones was "the definitive country singer of the last half-century" with such hit songs such as Why Baby Why, She Thinks I Still Care, The Race Is On, Golden Ring, He Stopped Loving Her Today, and I Don't Need Your Rockin' Chair. Jon Pareles, George Jones, Country Music Star, Dies at 81, N.Y. Times, April 26, 2013, http://www.nytimes.com/2013/04/27/arts/music/george-jones-country-singer-dies-at-81.html.

[2] Mr. Jennings is the son of Waylon Jennings "who defined the outlaw movement in country music." Waylon Jennings, Country Singer, Dies at 64, N.Y. Times, Feb. 13, 2002, http://www.nytimes.com/2002/02/13/obituaries/waylon-jennings-country-singer-dies-at-64.htm. Waylon Jennings was also the narrator for the television show The Dukes of Hazzard and sang its theme song, which described the protagonists as just some "good ol' boys" who had "been in trouble with the law since the day they was born." Id.; Waylon Jennings, Theme from "The Dukes of Hazzard" (Good Ol' Boys), on Music Man (RCA Victor 1980).

time later, Mr. Jennings and a few other people arrived. Mr. Beddingfield testified that the Defendant "was behind the bar serving drinks" and that the Defendant was the only person whom he saw serving alcohol that night. Mr. Beddingfield also recalled that he saw Mr. Jennings smoking inside, which he thought was odd because the Defendant "was always pretty anal about people lighting up in his bar," but thought it had something to do with the fact that the Defendant was a "massive . . . fan" of Mr. Jennings' father.

Mr. Beddingfield testified that Mr. Mills "was in a good mood all night" and was excited about a new songwriting opportunity that would allow him to spend more time at home with his family. Mr. Beddingfield recalled that Mr. Mills "went outside to smoke a couple of times" while he was there. Mr. Beddingfield further testified that he "knew there were guns in the bar" but that he did not see any while he was there. Mr. Beddingfield did not see any drugs while he was there. Mr. Beddingfield also did not see Mr. Mills go behind the bar. While he knew that the Defendant and Mr. Mills had been drinking, Mr. Beddingfield testified that neither man seemed drunk that morning.

Mr. Beddingfield testified that the next couple of hours were spent "just hanging out, drinking." Before Mr. Beddingfield left, the Defendant insisted that he get a picture with Mr. Jennings, Mr. Jennings' "road manager," Mr. Beddingfield, and Mr. Mills in one of the establishment's booths. Mr. Beddingfield estimated that he left the Pit and Barrel sometime between 4:00 and 4:30 a.m. Mr. Beddingfield recalled that when he left, "[i]t was a great mood" and "there was no tension and there was no arguments." Mr. Beddingfield further recalled that there "was no aggression throughout the entire" time he was there and that the Defendant and Mr. Mills were friends.

Thomas Howard testified that he was an aspiring songwriter and that he came to Nashville on the night of the "George Jones tribute" in order to go out with his manager, Susan Branam, and meet some "people affiliated with the [country music] business." Mr. Howard went out to dinner with Ms. Branam and his then girlfriend, Nadia Markham. After dinner, the three went to a club where they stayed until "after [it] closed." At that point, Ms. Branam suggested to Mr. Howard that they go to the Pit and Barrel "because there [were] going to be a few people over there that [he] might be interested in meeting," specifically Mr. Jennings. Ms. Branam drove because Mr. Howard and Ms. Markham "had drank some" that night.

Mr. Howard estimated that they got to the Pit and Barrel sometime between 2:00 and 2:30 a.m. Mr. Howard testified that he had been to the Pit and Barrel and had met the Defendant before that morning. Mr. Howard described the atmosphere at the bar as "relaxed for the most part" with "[g]roups of people . . . tak[ing] turns playing music." Mr. Howard estimated that he was at the Pit and Barrel for over two hours. During that time, Ms. Branam introduced Mr. Howard "to a few people." Mr. Howard had never met Mr. Mills before that morning. Mr. Howard recalled that he and Mr. Mills "just had

general conversation for a few minutes." Mr. Howard also recalled seeing Mr. Mills smoking inside the Pit and Barrel that morning. Mr. Howard testified that the Defendant was serving alcohol and that he did not remember anyone other than the Defendant being behind the bar.

Mr. Howard testified that around 4:30 a.m., he, Ms. Branam, and Ms. Markham were preparing to leave. The only other people remaining at the Pit and Barrel were the Defendant and Mr. Mills. According to Mr. Howard, Mr. Mills was sitting at the bar smoking a cigarette and the Defendant was behind the bar. The Defendant walked up to Mr. Mills, slapped the cigarette out of Mr. Mills's hand, and said, "[W]hat the [f--k] are you doing smoking in my bar; it's a nonsmoking bar." Mr. Howard testified that Mr. Mills "just kind of sat there for a second" and "then he got up and paced back-and-forth a few times going toward the door." Mr. Howard thought that Mr. Mills "was leaving," but Mr. Mills turned around and said to the Defendant, "[I]f you ever smack my hand like that again, I'll kill you."

At that point, Ms. Branam told Mr. Howard and Ms. Markham that it was time for them to leave. Mr. Howard recalled that Ms. Branam and Ms. Markham left first. As he "was getting ready to walk out," Mr. Howard "turned around and looked behind [him] one more time and witnessed Mr. Mills throw his beverage glass on the ground and break it." Mr. Howard "took a few steps" outside and "heard the door [to the bar] open" again. Mr. Howard testified that "just as soon as [he] heard the door open, [he] heard three [gun]shots in rapid succession." Mr. Howard then "turned around and saw Mr. Mills hit the ground." Mr. Howard testified that he did not see anything in Mr. Mills's hands and that Mr. Mills fell facedown. Mr. Howard recalled that Mr. Mills's head was pointing away from the door and that the door had closed after Mr. Mill fell.

Mr. Howard ran to Ms. Branam's vehicle, "jumped in the backseat[,] and told them to leave because [Mr. Mills] had been shot." As they drove away, Mr. Howard saw the Defendant "run out the door of the bar." They circled around the block, and when they came back to the Pit and Barrel, "[n]o one was outside" and "there wasn't a body there." At that point, Ms. Branam called the Defendant to ask him what had happened. Mr. Howard recalled that the Defendant "was very upset" and crying. Ms. Branam advised the Defendant to call 911. Ms. Branam then hung up and called 911 herself.

Mr. Howard testified that he had not seen any guns in the Pit and Barrel that morning. Mr. Howard admitted that he had three beers and "some [v]odka." Mr. Howard did not recall Mr. Jennings' taking a picture with the Defendant and Mr. Mills. Mr. Howard denied that he heard Mr. Mills yell, "[T]here is [sic] no whores here, there's no cocaine here, what the f--k am I [doing] here." Rather, Mr. Howard testified that Mr. Mills was "in a pretty good mood" that morning. Mr. Howard admitted that he told the Defendant's private investigator that Mr. Mills and the Defendant "were very loud and

-4-

yelling back and forth at each other." Mr. Howard also told the private investigator that he heard the gunshots "immediately" after he heard the glass break. However, Mr. Howard claimed that he was mistaken when he told the private investigator that.

An audio recording of the Defendant's 911 call was played for the jury. The call was made at 4:56 a.m. on November 23, 2013. On the recording, the Defendant told the 911 operator that "someone [had] just pulled a gun on [him] in [his] bar." The Defendant then told the operator that there was "no danger now" but asked that "help and [a] medic" be sent to the Pit and Barrel. The operator asked the Defendant if he needed an ambulance, and the Defendant responded that he did. The operator asked the Defendant if he had been shot, and the Defendant responded, "No, somebody tried to f--king pull a gun on me. I dispatched weapon [sic] and someone had pulled a gun on me." The Defendant stated that the person who had "pulled a gun on" him was "erratic in there" and had been shot.

Officer Ashley Arnold of the Metropolitan Nashville Police Department (MNPD) was one of the first officers to respond to the Pit and Barrel after the Defendant's 911 call. Officer Arnold found the Defendant standing outside and talking on his cell phone. Officer Arnold recalled that the Defendant "was kind of hysterical" and repeatedly stated, "[H]e tried to rob me," and "I thought he was going to kill me." Despite the fact that the officers approached the Defendant with their guns drawn, Officer Arnold testified that the Defendant "didn't really speak with [them]." Instead, the Defendant "was upset, crying" and focused on his phone conversation. Officer Arnold recalled that when the officers "finally got [the Defendant] to kind of tell [them] what happened," the Defendant simply "pointed to the door and said, '[H]e's inside.'"

Officer Arnold found Mr. Mills inside, approximately six feet from the door. Mr. Mills was "lying face up" with some towels underneath him. Mr. Mills "was breathing heavily" with "obvious trauma to the back of his head." Mr. Mills was taken to a local hospital where he died later that morning. About thirty minutes after the police arrived at the Pit and Barrel, Ms. Branam and Ms. Markham approached the responding officers. Both of the responding officers thought that the women were intoxicated. Ms. Branam and Ms. Markham led one of the officers back to Ms. Branam's vehicle where Mr. Howard was found sitting inside the vehicle.

At some point, the Defendant entered the Pit and Barrel and was standing by the doorway while the officers checked on Mr. Mills. One of the officers escorted the Defendant back outside. While he was standing outside, the Defendant spoke to MNPD Sergeant Michael Kent. Sgt. Kent recalled that the Defendant was on his cell phone and looked "very upset." Sgt. Kent testified that the Defendant, "unprovoked" and "very excitedly," said to him, "I just shot my friend in the head. Oh, my God, I just shot my friend in the head. He said he was going to kill me and I just shot him." Sgt. Kent patted

down the Defendant and did not find any weapons on him. The Defendant gave Sgt. Kent his wallet and Sgt. Kent "retrieved [the Defendant's] Tennessee handgun carry permit from it." Sgt. Kent testified that he was "unsure" if the Defendant was intoxicated.

MNPD Detective Leonard Peck, Jr., was the lead investigator in this case. Det. Peck testified that the Defendant consented to a search of the Pit and Barrel. Det. Peck spoke with the Defendant there, and the Defendant "stated that the victim displayed a gun, threatened his life," and that "resulted in the shooting death of . . . Mr. Mills." Later, the Defendant was transported to the police station where Det. Peck conducted a more in-depth interview. A video recording of that interview was played for the jury during the trial.

The Defendant began the interview by telling Det. Peck that Mr. Mills was "drunk, drunk" when he met him that night. The Defendant claimed that he was going to let Mr. Mills stay at the Pit and Barrel until he sobered up. The Defendant then claimed that Mr. Mills "progressively got more belligerent through" the morning. The Defendant told Det. Peck that the shooting occurred after he saw Mr. Mills smoking at the bar. The Defendant explained that he was "vehemently against any smoking in [his] bar," so he reached across the bar and crushed Mr. Mills' cigarette.

The Defendant claimed that Mr. Mills "went off" and started "screaming and hollering." According to the Defendant, he told Mr. Mills to leave but that Mr. Mills came back into the bar. The Defendant told Det. Peck that he saw a drink in Mr. Mills' hand and that he told Mr. Mills that he could not take the drink outside. The Defendant claimed that Mr. Mills then said, "F--k you, I'll do whatever I want," and threatened to kill him. The Defendant stated that Mr. Mills threw his glass down and that he "watched [Mr. Mills] grab something that [he] thought was a gun."

The Defendant told Det. Peck that he was standing by his register behind the bar and that he "had no intention of shooting" Mr. Mills. However, the Defendant said that Mr. Mills had "scared the hell out of [him]." The Defendant pulled a gun he kept behind the bar and shot in Mr. Mills' direction. The Defendant claimed that he did not aim at Mr. Mills and that he could not remember pulling the trigger or how many times he shot at the victim.

The Defendant told Det. Peck that he watched Mr. Mills fall out the door and onto the ground. The Defendant stated that he thought Mr. Mills was faking his injury. The Defendant went outside to check on Mr. Mills. The Defendant told Det. Peck that it was very cold outside and that he decided to drag Mr. Mills back inside because he was getting cold from having just a t-shirt on. The Defendant stated that he got some bar rags

to try to stop the victim's bleeding. The Defendant recalled that Ms. Branam called him and that he called 911 after he spoke to her.

The Defendant insisted that he saw Mr. Mills grab for something and saw something in his hand after he threw the glass. The Defendant claimed that he found a .45 caliber revolver on the floor by the doorway after he dragged Mr. Mills back into the bar. The Defendant told Det. Peck that he "secured the weapon, . . . unloaded it," and "put it on the table." The Defendant stated that the revolver was his and that he normally kept it by the cash register. The Defendant told Det. Peck that he did not know how Mr. Mills got the revolver.

Det. Peck told the Defendant that he thought it was highly unlikely that Mr. Mills took the Defendant's revolver from behind the bar. Det. Peck pointed out that Mr. Mills did not know where the revolver was and that the Defendant was "strategic" in where he kept his guns. The Defendant repeatedly insisted that Mr. Mills could have easily found the revolver behind the bar. The Defendant was very upset because he was unable to find his "bank bag" that morning.[3] The Defendant told Det. Peck that he kept the bag by the cash register with the revolver. The Defendant implied that Mr. Mills may have stolen the bag and suggested that Mr. Mills took the revolver to scare him with it.

For several minutes, Det. Peck continued to press the Defendant to "tell the truth," and the Defendant continued to insist that Mr. Mills could have found the revolver behind the bar and taken it to scare him. The Defendant became visibly upset when Det. Peck called him a liar. The Defendant began to cry and exclaimed that Mr. Mills had "pointed his cell phone at [him], it was his f--king cell phone." The Defendant explained that he was scared because Mr. Mills had screamed more than once that he would kill the Defendant. The Defendant claimed that he shot Mr. Mills when Mr. Mills spun around and pointed his cell phone at the Defendant. The Defendant stated that he thought, at that moment, Mr. Mills was going to shoot him. The Defendant then stated that he panicked and put the revolver on the table near the doorway.

At that point, Det. Peck left the interview room. Once he was alone in the room, the Defendant said that he was "terrified" and asked, "Wayne, you stupid son of a b---h, why did you do that?" Eventually the Defendant stopped crying and started using his cell phone. When Det. Peck returned, he began to advise the Defendant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). The Defendant asked if he was under arrest, and Det. Peck responded that he just wanted to get "an official statement." Sensing the Defendant's uneasiness about the Miranda warnings, Det. Peck asked the Defendant how he felt. The Defendant responded that he felt "like s--t" and that he was exhausted and

---

[3] The bag was eventually found in the Defendant's possession.

terrified "that [he] hurt somebody." The Defendant denied that he was drunk and said that he did not have a lot to drink that morning.

Det. Peck asked the Defendant if he wanted to keep talking without a lawyer. The Defendant said that he did not do anything "out of line," but that he would be "an idiot not to have a f--king lawyer present to make a statement about something that involve[d] [his] freedom." The Defendant told Det. Peck that he would not go to jail "for f--king defending [him]self." The Defendant claimed that Mr. Mills was known to get drunk and belligerent and that Mr. Mills had screamed "five different times" that morning that he would kill the Defendant.

The Defendant reiterated that Mr. Mills threw the glass and said, "I'm going to come over there and f--king kill you." The Defendant told Det. Peck that he simply "took [Mr. Mills] at his word." The Defendant then told Det. Peck that he was cold, tired, and wanted to come back later after he had the chance to talk to his family. The Defendant explained that he wanted to see his family because they were supposed to be "celebrating" that day but now that was "not going to happen." Det. Peck testified at trial that he stopped the interview after he realized Mr. Mills was unarmed and "the crime scene was altered." Det. Peck also testified that he did not have the Defendant tested for drug or alcohol use.

Mr. Beddingfield testified that he did not learn that there had been a shooting at the Pit and Barrel until around 10:00 or 11:00 a.m. There was some confusion about the identity of the victim. Mr. Beddingfield first tried to call Mr. Mills, and when Mr. Mills did not answer his phone, Mr. Beddingfield called the Defendant. Mr. Beddingfield recalled that the Defendant was "hysterical" when he answered the phone. The Defendant told Mr. Beddingfield that "he knocked a cigarette out of [Mr. Mills'] mouth and that made [Mr. Mills] go crazy." The Defendant then said that Mr. Mills had "slammed a beer bottle down."

The Defendant explained that he "felt threatened" and thought that Mr. Mills "was going to kill him." The Defendant claimed that Mr. Mills had "reached for his waistband." The Defendant asked Mr. Beddingfield "why did [Mr. Mills] have to be so crazy?" The Defendant claimed not to remember what kind of gun he had used or where he had shot Mr. Mills. Mr. Beddingfield admitted that he originally did not mention the fact that the Defendant said he knocked a cigarette out of Mr. Mills' mouth to Det. Peck.

### B. The Physical Evidence

Outside of the Pit and Barrel, the police found a small pool of blood several feet away from the entrance, a "small blood trail leading" from the pool of blood "back into" the establishment, and a button and broken button fragments near the blood trail. Blood

was also found on the door frame and the "door threshold." Inside, there were "drag marks" of blood on the floor leading from the doorway to another pool of blood and the bloodied towels that had been placed beneath the victim. Next to the towels was the victim's baseball cap. The cap was bloodied with an apparent bullet hole in the back, toward the top, of the cap. There was also "some damage to the left side" of the cap.

To the immediate right of the doorway, upon entering the building, was a table. At the foot of the table, the investigators found half of a broken glass, fragments of glass, and a green cigarette lighter. To the left of the doorway was a wooden barrel with the initials "P" and "B" painted on it. In front of the barrel and against the left wall of the building, the investigators found a piece of broken glass with a small amount of blood on it. Also against the wall and a few inches away from the piece of broken glass was a .22 caliber cartridge casing. Near the broken piece of glass and the cartridge casing was "a high-top bar table." The table was directly to the left of where the victim was found. On the table the officers found an unloaded .45 caliber revolver "with the cylinder open."

To the right of where the victim was found was the bar, which "had like an L-shape to it when you [got] close to the entrance." The bottom of the bar was parallel to the front wall and the longer portion of the bar was parallel to the aisle leading from the front to a stage and more seating in the back. The investigators found .45 caliber ammunition on the bottom portion of the bar. The victim's cell phone was found on the longer portion of the bar near where it formed a right angle with the bottom portion. The investigators found a .22 caliber handgun with "some kind of scope on it" further up the bar. A cigarette butt was found on the floor in front of the bar between where the gun and the cell phone were found. All of the chairs along the bar were "at an angle" except for one "that was facing the bar directly" near where the .22 caliber handgun was found.

Moving away from where the victim was found, another cigarette butt was found on a table near the stage. A second .22 caliber cartridge casing was found in front of the bar where the bar made "a curve" toward the back of the building. A third .22 caliber cartridge casing was found on the gurney that transported the victim to the hospital. Crime scene investigators for the MNPD testified at trial that they gave "very little weight" to the location of the cartridge casings because the casings were small, lightweight, and could easily "bounce, get kicked, [or] roll." A third handgun, another revolver, was located inside a safe in the building's office. A powder on the bar, which could have been cigarette ash, was identified in some of the crime scene photographs. However, it was not specifically documented by the investigators and was not collected as evidence. There was no blood spatter found on the door, door frame, or the walls. There were also no working security cameras in the building.

Two bullet strikes were found on the wall behind the barrel. The first was between the doorway and a window and was found by the investigators the day of the

shooting. That piece of wood was removed from the wall and a bullet fragment was removed from the wood. A second bullet strike and fragment were found by the Defendant's private investigator several days after the shooting. The second bullet strike was on the other side of the window approximately three feet from the first strike. The second bullet strike was "similar in size [to] some of the nailheads that . . . [could be seen] through the wood" and blended in with the wood.

Both bullets "were going from left to right" when they impacted the wall. The first bullet entered the wall at a thirty-seven degree angle. The second bullet entered the wall at a twenty-five degree angle. The first bullet strike was two inches higher than the second. From the placement of the bullet strikes, it appeared to the crime scene investigators "that the shooter did not move much." However, there was no way to determine "the shot sequence" based upon the forensic evidence. Initially, the crime scene investigators thought there was a third bullet strike on the window frame, but that turned out not to be the case. The investigators also found a chip of wood near the victim's cap that could have come from the first bullet strike.

Tennessee Bureau of Investigation Special Agent Teri Arney testified as an expert in firearms identification. Agent Arney opined that the cartridge casings she examined had been fired from the Defendant's .22 caliber handgun. Agent Arney also testified that the bullet fragment removed from the victim's brain was a .22 caliber bullet and consistent with .22 caliber ammunition that had been found at the Pit and Barrel. Agent Arney further testified that the recoil from a .22 caliber handgun would tend to tip the muzzle of the gun upwards depending "on the skill of the shooter."

Doctor Erin Michelle Carney testified as an expert in forensic pathology. Dr. Carney performed an autopsy on the victim's body. Dr. Carney testified that the victim had a blood alcohol level of .221 and a "relatively low amount of amphetamine" in his blood. Dr. Carney noted that the victim had abrasions on the left side of his forehead and temple and on the back of his head. Dr. Carney also found "quite a few areas of bruising" on "both sides of his chest, both arms, and . . . on his forearms." The victim also suffered some abrasions on his abdomen, contusions "on his left thigh [and] on his right knee," and fractures to his left ribs. Dr. Carney opined that these injuries could have been caused by the victim's falling to the ground.

Dr. Carney testified that the victim suffered a gunshot wound to the back of his head. Dr. Carney noted that there was no soot or stippling, which suggested that the bullet had not been fired from close range. Dr. Carney testified that the bullet entered the victim's skull and brain and traveled "back to front, slightly left to right, and downward" until it came to rest in the victim's right frontal lobe where Dr. Carney recovered it. Dr. Carney opined that it would have been possible for the victim to have taken several steps

after he was shot. Dr. Carney concluded that the manner of the victim's death was homicide and that the cause of death was a "[g]unshot wound of the head."

## II. Defendant's Proof

Ms. Markham testified on the Defendant's behalf. Ms. Markham stated that she was a bar manager on a cruise ship and that she was dating Mr. Howard at the time of the murder. Ms. Markham testified that she knew the Defendant and that he invited her, Mr. Howard, and Ms. Branam to the Pit and Barrel on the morning of November 23, 2013. Ms. Markham estimated that they arrived around 3:30 a.m. Ms. Markham testified that she and Mr. Howard were "heavily" intoxicated that night but that Ms. Branam was sober because she was the designated driver.

Ms. Markham claimed that she spent most of her time at the Pit and Barrel with Mr. Howard either outside smoking or in the bathroom. However, Ms. Markham also claimed that, at the Defendant's request, she got behind the bar and served drinks that morning and that everyone inside was happy. Ms. Markham testified that she was introduced to Mr. Mills. According to Ms. Markham, she and Mr. Howard were in the bathroom having a "rendezvous" just before they left the Pit and Barrel. Ms. Markham recalled that when she exited the bathroom, she saw Mr. Mills sitting at the bar.

Ms. Markham testified that Mr. Mills "lit up a cigarette," that the Defendant approached him from the other side of the bar, and that the Defendant told Mr. Mills "not to smoke in the bar." According to Ms. Markham, Mr. Mills "got a little hostile" and "it escalated from there." Ms. Markham testified that Mr. Mills and the Defendant raised their voices and began swearing at each other. Ms. Markham recalled that Mr. Mills got up from his bar stool and walked toward the door with "a full glass" in his hand. According to Ms. Markham, Mr. Mills was standing "[r]ight by the door," continuing to swear at the Defendant, and "kind of propping [the door] open." Ms. Markham recalled hearing Mr. Mills threaten the Defendant by saying, "[I]f you ever talk to me like that again, I'll [f--king] kill you." Ms. Markham claimed that she and Ms. Branam "walked under his arm" to get out of the doorway.

Ms. Markham testified that as she was getting into Ms. Branam's vehicle, she heard the "[v]ery loud" sound of glass breaking followed by three gunshots. When she heard the gunshots, Ms. Markham saw Mr. Howard running to Ms. Branam's vehicle. Once Mr. Howard was inside the vehicle, Ms. Branam drove away. Ms. Markham testified that she did not know what had happened to Mr. Mills and that she never saw Mr. Mills after she left the Pit and Barrel, but that Mr. Howard was "very upset" when he got in the vehicle.

Ms. Branam called the Defendant and put the call on "speaker phone." Ms. Markham testified that the Defendant "was sobbing . . . hysterically" and that she could not make out what he was saying. According to Ms. Markham, Ms. Branam parked her truck near the bar, she and Ms. Branam got out, and they walked "up . . . to the police." Ms. Markham claimed that Mr. Howard stayed in the vehicle "because he said he was nervous." Ms. Markham also claimed that she saw Mr. Howard take "a Klonopin" that morning.

Ms. Markham testified that she could not recall telling Det. Peck that the Defendant "got angry" and that Mr. Mills was leaving because the Defendant "was getting mad at" him. Ms. Markham admitted that she told Det. Peck that she saw Mr. Mills lying outside as Ms. Branam was driving away from the Pit and Barrel. Ms. Markham also admitted that she told Det. Peck that when Mr. Howard got into Ms. Branam's vehicle, he said that Mr. Mills had been shot in the back. Ms. Markham did not recall telling Det. Peck that she "never heard Mr. Mills say, 'I'm going to kill you.'"

Ms. Markham admitted that she told Det. Peck that the Defendant had "shot a man over a cigarette" and that "the only thing Mr. Mills did was smoke a cigarette inside the bar." Ms. Markham further admitted that she told Det. Peck that "Mr. Mills was walking out the door and trying to leave" and that "Mr. Mills never made a threat to the [D]efendant." Ms. Markham explained her inability to recall some of what she told Det. Peck and the inconsistencies between her statement to Det. Peck and her testimony were due to the fact that she was still intoxicated when she spoke to Det. Peck. Ms. Markham further admitted that she did not "remember a lot of things" from that morning.

Larry Flair, Sr., testified that he was a licensed private investigator retained by the Defendant. Mr. Flair testified that he was a former homicide detective who had investigated over 400 cases. Mr. Flair was allowed to testify as an expert in "crime scene reconstruction." Mr. Flair went to the Pit and Barrel a few days after the shooting. While examining the crime scene, Mr. Flair found a bullet strike on the wall and a bullet fragment embedded in the wall. Mr. Flair contacted the police and the bullet fragment was collected as evidence. Mr. Flair opined that the bullets had been fired "from left to right" with the left bullet being higher than the right one. However, Mr. Flair admitted that this did not "have any bearing on . . . what order [the bullets] were [fired]." Mr. Flair also noted that the scope on the .22 caliber handgun was off when he examined it at the police station. Mr. Flair additionally noted that the door to the Pit and Barrel would close automatically but that it would only latch shut about fifty percent of the time.

The Defendant testified on his own behalf at trial. According to the Defendant, he had met Mr. Mills "[a]pproximately [ten] years ago" when they were both "pursuing music" careers. The Defendant testified that he and Mr. Mills were friends, that Mr. Mills had played at the Pit and Barrel, and that he had put up a sticker for Mr. Mills's

band inside the Pit and Barrel.  The Defendant recalled that he closed the Pit and Barrel around 11:30 p.m. on November 22, 2013.  The Defendant went downtown where he ran into Mr. Howard, Ms. Branam, and Ms. Markham at a restaurant before going to a bar to see Mr. Jennings perform.  While Mr. Jennings was performing, the Defendant saw Mr. Mills.  The Defendant testified that he spoke to Mr. Mills, and that they were both happy that night.

Around 3:00 a.m. on November 23, 2013, the Defendant invited "[s]everal people" back to the Pit and Barrel for "an after-hours party."  The Defendant testified that Mr. Mills rode with him to the Pit and Barrel.  The Defendant recalled that both he and Mr. Mills had been drinking that morning.  The Defendant also claimed that he allowed Ms. Markham to go behind the bar and serve drinks.  The Defendant admitted that he allowed Mr. Jennings and Mr. Jennings' manager to smoke inside the Pit and Barrel.  The Defendant testified that he "let it go" because he was "hoping to get Mr. Jennings to play at the bar."  According to the Defendant, when the picture with himself, Mr. Jennings, Mr. Beddingfield, and Mr. Mills was taken everyone was happy and "having a good time."

The Defendant claimed that around 4:30 a.m., he was "closing" the bar when he overheard Mr. Mills loudly say, "I can't get a cab; there's no cocaine and there's no f--king whores here; why the f--k am I even here?"  According to the Defendant, when he looked up, Mr. Mills was smoking a cigarette at the bar.  The Defendant testified that Mr. Mills was seated at the bar and that he was behind the bar when he approached Mr. Mills.  The Defendant claimed that he told Mr. Mills to put the cigarette out and that Mr. Mills responded "that he didn't have to put it out and that he helped build that bar and what was [the Defendant] going to do about it."  According to the Defendant, Mr. Mills swore at him and was using the "top of the bar" for an ashtray.

The Defendant testified that Mr. Mills' actions made him angry and that he "reached across the bar and took the cigarette from [Mr. Mills'] hand and crushed it and threw it on the floor."  The Defendant claimed that Mr. Mills just "sat there" without saying anything for a minute and that then, "[h]e got angry" and said "that if [the Defendant] ever took a cigarette from his hand again that he'd kill" the Defendant.  The Defendant testified that he and Mr. Mills began swearing and yelling at each other.  According to the Defendant, he told Mr. Mills that "he needed to leave."  The Defendant claimed that Mr. Mills got up and "walked back and forth [around] the bar."

The Defendant testified that Mr. Mills eventually walked toward the door with a drink in his hand.  The Defendant told Mr. Mills that he could not "take the f--king drink with [him]."  The Defendant claimed that Mr. Mills "spun around, extremely mad, and he said[,] '[I]f you ever f--king talk to me like that again, I'm going to kill you.'"  The Defendant further claimed that Mr. Mills "stopped" and said, "[Y]ou know what, f--k it,

-13-

I'm going to kill you." According to the Defendant, Mr. Mills then "smashed [his] glass in the front of the bar." The Defendant claimed that after Mr. Mills smashed his glass on the floor, "he turned to the right." The Defendant testified that when Mr. Mills turned, he "couldn't see [Mr. Mills's] hands anymore."

The Defendant testified that he had never known Mr. Mills to act like that and that he was afraid. The Defendant further testified that he kept the .45 caliber revolver by the cash register for "[s]elf-defense." The Defendant stated that he also kept the .22 caliber handgun for self-defense and for target practice. The Defendant recalled that the .22 caliber handgun was "under the bar" on "top of the cooler." The Defendant testified that he was standing behind the bar when Mr. Mills threw his glass and threatened him. The Defendant "retrieved [his] .22 caliber and fired it . . . in fear" when Mr. Mills' hands disappeared from view. The Defendant testified that he when he fired, he could not see Mr. Mills because there "were only a few lights left on" and it "was very dimly lit" inside the building. Instead, the Defendant claimed that he just fired into the corner of the building near where Mr. Mills had been standing and that he did not know how many times he fired.

The Defendant claimed that after shooting at Mr. Mills, he "was in shock" and just "stood there" "[f]or a bit." The Defendant then "walked around the bar" and went "[t]owards the door." The Defendant testified that he "paused at the door" to listen because he "didn't know if anybody was still there." When he opened the door, the Defendant "saw Mr. Mills laying outside." The Defendant claimed that he was still holding his .22 caliber handgun "[b]ecause [he] was still in fear." The Defendant "leaned down to check" Mr. Mills. The Defendant testified that he saw that Mr. Mills was unconscious and bleeding from his head.

The Defendant testified that he went back inside "[t]o put down [his] firearm." The Defendant then went back outside and "rolled [Mr. Mills] over" and dragged him inside. The Defendant explained that he "thought [he] could better care [for Mr. Mills] there." The Defendant testified that he got some bar towels and "used them to try and stop the bleeding." However, the Defendant also took the time to search Mr. Mills for a weapon. When the Defendant could not find a weapon on Mr. Mills' person, he then searched the "front of the bar." The Defendant testified that he found Mr. Mills' cell phone and "panicked" because he "believed that [Mr. Mills] had a weapon and [he] couldn't find one."

At that point, the Defendant heard his cell phone ringing because Ms. Branam was calling him. The Defendant testified that when he answered his phone, he was standing behind the bar "[d]irectly next to" the .45 caliber revolver. The Defendant further testified that he was "[h]ysterical" when he spoke to Ms. Branam. However, the Defendant also testified that while he was speaking with Ms. Branam, he picked up the

revolver, unloaded it, placed the ammunition on the bar, and put the revolver "on the table." The Defendant admitted that he had stopped rendering aid to Mr. Mills because he had "panicked and [he] was thinking of [him]self."

The Defendant testified that he called 911 upon Ms. Branam's suggestion that he do so. The Defendant admitted that he lied to the 911 operator about what had happened. The Defendant then went outside to wait on the police to arrive. The Defendant admitted that during this time, he was more concerned with his dog getting out than with Mr. Mills. The Defendant further admitted that he lied to the responding officers about what had happened. The Defendant testified that he had been awake for over twenty-four hours at that point. The Defendant was placed in a squad car before he was taken to the police station to give his statement. The Defendant claimed that he "just sat [in the squad car] in silence and prayed." However, the Defendant admitted that he also took a nap in the squad car.

The Defendant further admitted that he initially lied to Det. Peck about what had happened that morning and claimed that Mr. Mills had a gun. The Defendant claimed, however, that he eventually told Det. Peck the truth about what had occurred. The Defendant admitted that he told Det. Peck that he could not remember how many times he shot at Mr. Mills but that he was able to tell Mr. Flair that he had fired three shots. The Defendant also admitted that he did not tell Det. Peck about Mr. Mills's alleged outburst about cocaine and whores but that he did tell Mr. Flair about it.

The Defendant testified that he had prior paramedic training and that he knew not to unnecessarily move a victim or leave a victim unattended. The Defendant also testified that he was an avid gun enthusiast and that he liked talking about and shooting guns. The Defendant admitted that he liked to "target practice" with his .22 caliber handgun and that he was "a good shot." The Defendant testified that the Pit and Barrel was originally named BoondoxXx before it appeared on the television program <u>Bar Rescue</u>.[4] The Defendant admitted that rat droppings were found in the restaurant and that he was shown on camera "serving up underprepared and underheated meat" to customers. The Defendant also admitted that he was shown on the program swearing and yelling at his employees, but he claimed that he just did it for effect because "that's TV."

*III. Conviction and Sentencing*

---

[4] <u>Bar Rescue</u> is a reality television series airing on the cable network Spike in which the host "offers his professional expertise plus renovations and equipment to desperately failing bars in order to save them from closing." <u>Bar Rescue</u>, <u>Wikipedia</u>, http://en.wikipedia.org/wiki/Bar_Rescue (last visited Oct. 5, 2016).

Based upon the foregoing evidence, the jury convicted the Defendant of second degree murder. The trial court conducted a sentencing hearing at which Mr. Mills' sister and his widow testified about the impact his death had on their lives. A letter written by Mr. Mills' eight-year-old son discussing the impact of his father's death was also read into the record. The Defendant's presentence report revealed that he had a prior conviction for driving under the influence (DUI). The State also presented the testimony of MNPD Officer Shane Rossin about an alleged incident of domestic violence that occurred between the Defendant and his girlfriend a few months before the murder. However, those charges were dismissed after the preliminary hearing.

The Defendant stated in allocution that he was sorry for killing Mr. Mills. The Defendant stated that he had no hesitation about inviting Mr. Mills to the Pit and Barrel that morning even though he "was aware of [Mr. Mills's] prior DUI and his assault." The Defendant explained that he "did not want [Mr. Mills] to have any more trouble and [he] could tell [Mr. Mills] had been drinking that night." The Defendant claimed that he thought Mr. Mills "had simply left" after he shot at him and that he "had no idea it was as sever[e] as it turned out to be." The Defendant also apologized for having "compounded an already difficult and impossible situation" by lying to the police and planting the revolver near Mr. Mills.

The Defendant stated that he wanted to "express [his] sorrow and regret" to Mr. Mills' family but that he "was ordered by this court not to contact the Mills family." The Defendant apologized to his family and friends for what he had put them through. The Defendant told the trial court that he "tried to live a life helping others" and that he hoped and prayed "that the unfortunate actions of one night would not define [him] as a person." The Defendant reiterated that he "never wanted any of this to happen." The Defendant then asked the trial court to "allow [him] the opportunity to continue to help others in the future."

One of the Defendant's friends testified that the Defendant was "a good man" and that he had never known the Defendant "to be violent in any way." The Defendant also introduced over fifty letters from family and friends attesting to his good character. Ms. Branam also testified on the Defendant's behalf. Ms. Branam testified that Mr. Mills was drinking heavily on the morning of the shooting. Ms. Branam further testified that she heard Mr. Mills make a comment about there being "no cocaine, no whores" at the Pit and Barrel. However, Ms. Branam claimed that the Defendant was not in the room when Mr. Mills made that comment and admitted that she did not tell Det. Peck about the comment. Ms. Branam testified that she had known the Defendant for approximately fifteen years and that the Defendant stayed in her home for a time after the shooting.

The trial court sentenced the Defendant as a Range I, standard offender. The Defendant requested the minimum fifteen-year sentence while the State requested the

maximum sentence of twenty-five years. See Tenn. Code Ann. § 40-35-112(a)(1). The trial court found that the Defendant employed a firearm during the commission of the offense and placed "increased weight" on this enhancement factor. See Tenn. Code Ann. § 40-35-114(9). The trial court noted the Defendant's prior DUI conviction. See Tenn. Code Ann. § 40-35-114(1). The trial court also found that the Defendant had no hesitation about committing a crime when the risk to human life was high with respect to the danger the Defendant placed Mr. Howard, Ms. Branam, and Ms. Markham in when he fired at the victim. See Tenn. Code Ann. § 40-35-114(10). However, the trial court did not "place great weight on that" enhancement factor.

The trial court also examined the proposed mitigating factors raised by the Defendant. The trial court found that the Defendant did not act under strong provocation. See Tenn. Code Ann. § 40-35-113(2). The trial court rejected the Defendant's claim that a substantial ground existed that tended to excuse or justify his criminal conduct, though it failed to establish a defense. See Tenn. Code Ann. § 40-35-113(3). The trial court also rejected the Defendant's claim that he committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. See Tenn. Code Ann. § 40-35-113(11). The trial court gave "minimal weight" to the fact that he assisted the authorities in locating evidence, noting that the Defendant consented to a search of the Pit and Barrel. See Tenn. Code Ann. § 40-35-113(10). The trial court gave weight to the numerous letters presented on the Defendant's behalf and the "indication that in the past [the Defendant had] done good things" evidenced in the letters. See Tenn. Code Ann. § 40-35-113(13). Weighing the applicable enhancement and mitigating factors, the trial court imposed a twenty-year sentence.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for second degree murder. The Defendant does not dispute that he shot and killed the victim. However, the Defendant argues that he should have been acquitted for acting in self-defense because Mr. Mills had threatened to kill him and "made a sudden, violent act by smashing a glass on the concrete floor and then turning." The Defendant alternatively argues that he should have been convicted of voluntary manslaughter because the victim's actions immediately prior to the shooting amounted to "adequate provocation" which caused him to enter "a state of passion" and "act in an irrational manner." The State responds that the evidence was sufficient to sustain his conviction for second degree murder.

## A. Standard of Review

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

## B. Self-Defense

In this state, a person may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611-(b)(2). It is well established, under Tennessee law, "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)).

"It is axiomatic that threats of injury or death will not justify taking the life of the person making them, when he is doing nothing to put such threats into execution." State v. Young, 645 S.W.2d 255, 257 (Tenn. Crim. App. 1982). Viewing the evidence in a light most favorable to the State, the unarmed victim was shot in the back of the head as he attempted to leave the Pit and Barrel. The victim's repeated verbal threats to kill the Defendant alone did not justify the Defendant's actions. The Defendant claimed that immediately after making his last threat, the victim threw down his glass and turned towards the Defendant.[5] The breaking of the victim's glass, while certainly startling, was not evidence of the victim's attempting to put his "threats into execution." Nor was the simple act of turning towards the Defendant, even if the Defendant was unable to see the victim's hands. As such, the jury could have reasonably concluded that the victim did nothing to execute his threats prior to the Defendant's shooting at him.

Furthermore, "in all cases of self-defense, the force used must be reasonable, considering all of the circumstances." State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995). Here, the victim was unarmed when the Defendant, an avid gun enthusiast and self-proclaimed "good shot," retrieved one of the two firearms he had hidden behind the bar and shot multiple times at the victim. The threat of a physical assault by an unarmed assailant may sometimes justify the use of deadly force. See Bitner v. State, 169 S.W. 565, 568 (Tenn. 1914). However, we do not believe that was the case here. The victim was standing either near or immediately in front of the doorway, he was several feet away from the Defendant, and the bar was separating the two men. Based upon the foregoing evidence, we conclude that it was well within the province of the jury to reject the Defendant's claim of self-defense.

### C. Voluntary Manslaughter

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to the result of their conduct "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). In contrast, voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Similar to the question of self-defense, whether a knowing killing constituted second degree murder or voluntary manslaughter is a question for the jury. State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001) (citing State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995)).

---

[5] At various times, the Defendant has claimed that as the victim turned towards him, he saw a gun in the victim's hand, saw the victim holding his cellphone, and saw the victim reach toward his waist. The Defendant testified at trial that the victim turned and that he could no longer see the victim's hands.

The Defendant and the victim had been drinking throughout the night before and that morning when, in the early morning hours of November 23, 2013, they engaged in an argument over the victim's decision to smoke inside the Pit and Barrel. That argument included the Defendant's smacking a cigarette either from the victim's mouth or his hand. Both men began swearing and yelling at each other, and this culminated with the victim's threatening to kill the Defendant. After walking towards the doorway, the victim threatened to kill the Defendant one last time. The victim then threw his glass down on the ground and turned towards the Defendant. The Defendant was several feet away from the victim behind a bar where he had hidden two firearms.

Much like the law with respect to self-defense, "the law regards no mere epithet or language, however violent or offensive, as sufficient provocation for taking [a] life." Freddo v. State, 155 S.W. 170, 172 (Tenn. 1913). Therefore, the verbal altercation between the victim and the Defendant and the victim's threats to kill the Defendant, standing alone, could not provide "sufficient provocation for taking [a] life." Similarly, we do not think that the acts of breaking a glass or turning towards the Defendant are sufficient provocation to cause the Defendant to act in an irrational manner. As such, we conclude, again, that it was well within the province of the jury to reject the Defendant's argument for voluntary manslaughter. Accordingly, we hold that the evidence was sufficient to sustain the Defendant's conviction for second degree murder.

## II. *Ferguson* Jury Instruction

The Defendant contends that the trial court erred in denying his request for a special jury instruction regarding the State's failure to preserve evidence. Specifically, the Defendant argues that the police destroyed the data on Mr. Mills's cellphone by "covering [it] in magnetic fingerprint powder" and then compounded this error by "failing to even attempt to collect the phone's data from the phone company after they discovered their error." The Defendant alleges that an examination of Mr. Mills's cell phone data could have possibly shown what sent Mr. Mills "into an uncontrollable rage" on the morning of the murder. Additionally, the Defendant argues that the trial court applied the applicable law incorrectly to this issue. The State responds that the trial court did not err in rejecting the Defendant's request because "there was little, if any, indication that the contents of the phone would have proved relevant to the issues in the case."

Det. Peck testified on cross-examination that the data on Mr. Mills's cell phone was erased when magnetic fingerprint powder was placed on it. Det. Peck also testified that he had not attempted to retrieve that data from Mr. Mills's cell phone provider. At the close of the State's proof, the Defendant requested a special jury instruction regarding "the failure of the government to preserve many of the things [defense counsel had] questioned [Det.] Peck about."

The trial court asked defense counsel what the State had failed to preserve and defense counsel responded, "The telephone; the cell phone records. They didn't do the [gunshot residue test] on [the Defendant]. They had the cell phone and lost that, the data on that." In responding to the Defendant's request, the prosecutor stated that they did not "have any information about . . . why that phone [would have] contain[ed] anything exculpatory in this case." The trial court denied the request stating that it was "not even sure" that the cell phone "posses[ed] exculpatory value."

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution provide every criminal defendant the right to a fair trial. To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). Further, the State has a duty to turn over exculpatory evidence that would raise a reasonable doubt about the guilt of the defendant. United States v. Agurs, 427 U.S. 97, 110-11 (1976).

In State v. Ferguson, 2 S.W.3d 912, 916 (Tenn. 1999), our supreme court adopted a test for courts to use in determining whether the State's loss or destruction of evidence deprived a defendant of a fair trial. The first step of this test "is to determine whether the State had a duty to preserve the evidence." Id. at 917. The State's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." Id. To meet this materiality standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." State v. Merriman, 410 S.W.3d 779, 785 (Tenn. 2013).

Only if the trial court finds that the State failed in its duty to preserve evidence will the trial court then conduct a balancing analysis involving the following factors: (1) the "degree of negligence involved"; (2) the "significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available"; and (3) the "sufficiency of the other evidence used at trial to support the conviction." Ferguson, 2 S.W.3d at 917 (footnote omitted). After weighing these factors, if the trial court concludes "that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect that defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." Merriman, 410 S.W.3d at 785-86. On appeal, we apply a de novo standard of review to the trial court's decision on a Ferguson claim. Id. at 791.

At the outset, the Defendant argues that the trial court erred in conducting the Ferguson test as announced in our supreme court's opinion because Ferguson involved a

-21-

defendant's seeking dismissal of charges rather than a jury instruction. The Defendant argues that "a straight application of Ferguson was inappropriate in this context because [Ferguson] concern[ed] a higher remedy" and that the Ferguson factors "should at least be weighed on a lighter scale" when a defendant only seeks a jury instruction. However, our supreme court's opinions in both Ferguson and Merriman are clear that the full Ferguson analysis is to be conducted prior to the trial court's making a decision on the appropriate remedy. Merriman, 410 S.W.3d at 786 (stating that after conducting the Ferguson analysis and determining that proceeding without the missing evidence would be fundamentally unfair "the trial court may then impose an appropriate remedy"); Ferguson, 2 S.W.3d at 917. Accordingly, we conclude that the Defendant's argument in this respect is without merit.

Turning now to the materiality of victim's cell phone, the Defendant argues that the contents of the victim's cell phone would have shown why Mr. Mills had "an abrupt change in behavior" or could have corroborated the Defendant's testimony "and demonstrated the full extent of Mr. Mills's behavior" that morning. However, the evidence at trial established that the shooting occurred after the Defendant smacked a cigarette either from the victim's mouth or hand and the two men engaged in a verbal altercation. We doubt that anything discovered on the victim's cellphone would have shed light on whether the Defendant reasonably feared he was in danger of imminent death or seriously bodily injury or whether the Defendant was acting in a state of passion caused by the adequate provocation of the victim. While the contents of the victim's cell phone may have shown that he was sending angry or violent messages to third parties, no evidence supports this claim, and it was undisputed at trial that the victim had repeatedly yelled at, swore at, and threatened to kill the Defendant.

Furthermore, before concluding that the State has a duty to preserve evidence, there must also be a finding that the defendant was unable to obtain comparable evidence by other reasonably available means. Here, the contents of the victim's cell phone were inadvertently destroyed by the police when magnetic fingerprint powder was placed on the phone. Additionally, the State made no effort to obtain the victim's cell phone data from his cell phone company. However, "Ferguson does not discharge a defendant's obligation to conduct expedient investigations and to secure relevant, material evidence whenever possible." State v. Michael Orlando Freeman, No. E2014-02054-CCA-R3-CD, 2016 WL 912160, at *14 (Tenn. Crim. App. Mar. 10, 2016), no perm. app. filed. The victim's cell phone data was in the control of a third party, the victim's cell phone provider, from which the Defendant could have sought to obtain the data. The Defendant had hired defense counsel and a private investigator within days of the murder. As such, the Defendant could have obtained comparable evidence by other reasonably available means but chose not to do so. Accordingly, we affirm the trial court's denial of the Defendant's request for a Ferguson jury instruction.

-22-

### III. Self-Defense Jury Instructions

The Defendant contends that the trial court committed several errors when instructing the jury on self-defense. Specifically the Defendant argues (1) that the trial court erroneously rejected his request to charge "the State's burden to negate self-defense . . . with the other matters the State had to prove" and with the elements of each of the listed offenses; (2) that the trial court erroneously rejected his request to sever "the self-defense instruction [from] instructions on 'no duty to retreat' and non-deadly force"; and (3) that the trial court erroneously shifted the burden of proof onto him by rejecting his request to strike the words "[i]f evidence is introduced supporting self-defense" from the self-defense jury instruction. Relatedly, the Defendant also argues that the jury instructions "failed to properly charge that the State's burden of proof applied to lesser-included offenses." The State responds that the trial court's jury instructions provided a correct and complete charge of the applicable law; therefore, the trial court did not err in rejecting the Defendant's requests for special jury instructions.

### A. Standard of Review

A defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial." State v. Brooks, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). In determining whether a jury instruction correctly, fully, and fairly sets forth the applicable law, we review the instruction in its entirety. Id. (citing State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). "Phrases may not be examined in isolation." Id. (citing State v. Dellinger, 79 S.W.3d 458, 502 (Tenn. 2002)). Because the propriety of jury instructions is a mixed question of law and fact our review is de novo with no presumption of correctness. State v. Fayne, 451 S.W.3d 362, 373 (Tenn. 2014).

### B. State's Burden to Negate Self-Defense

The Defendant requested that the trial court add "the negation of the defense of self-defense" to the jury instruction listing the necessary elements the State needed to prove beyond a reasonable doubt. The Defendant also requested that the phrase "that the killing was not done in self-defense" be added as an essential element in the jury instructions for the charged offense and all of the listed lesser-included offenses. The Defendant based this request on Tennessee Code Annotated section 39-11-201(a), which reads as follows:

> No person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt:
> (1) The conduct, circumstances surrounding the conduct, or a result of the conduct described in the definition of the offense;

(2) The culpable mental state required;

(3) The negation of any defense to an offense defined in this title if admissible evidence is introduced supporting the defense; and

(4) The offense was committed prior to the return of the formal charge.

The Defendant argued that the jury instruction should mirror the structure of section 39-11-201(a).

The trial court rejected the Defendant's request stating that it felt the applicable Tennessee Pattern Jury Instructions provided a correct and complete charge of the law. While it rejected the Defendant's request to include the State's burden to negate his claim of self-defense in its general discussion of the State's burden of proof and the elements of the applicable offenses, the trial court did instruct the jury as follows:

If evidence is introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense before the defendant can be found guilty of any offense.

If from all the facts and circumstances you find the defendant acted in self-defense, or if you have a reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.

Defense counsel recently raised this issue, along with the other issues addressed in this section, in an unrelated case. See State v. Tanya Nicole Slimick, No. M2014-00747-CCA-R3-CD, 2015 WL 9244888, at *18-21 (Tenn. Crim. App. Dec. 17, 2015), perm. app. denied (Tenn. Apr. 6, 2016). After noting that trial courts "are not limited to mere recitation of the pattern instructions," a panel of this court rejected the defendant's argument and held that the pattern instructions provided a correct and complete charge of the law regarding the State's burden to negate a claim of self-defense, stating as follows:

While the requested instruction was not given in conjunction with the other statutory requirements, the jury instructions clearly informed the jury that the State bore the burden of negating self-defense beyond a reasonable doubt and that if the jurors had reasonable doubt that the defendant acted in self-defense, they were to acquit her.

Id. at *20 (internal quotation marks omitted). We find the reasoning of the Slimick opinion persuasive and adopt it here. Additionally, it is important to recognize that the jury instruction regarding the State's burden to negate the Defendant's claim of self-defense was given to the jury before it began deliberating. Accordingly, we conclude that

-24-

the trial court did not err in rejecting the Defendant's requested jury instructions regarding the State's burden to negate his claim of self-defense.

## C. Severance of the "No Duty to Retreat" Instruction with the Self-Defense Instruction

The Defendant requested that the trial court replace the Tennessee Pattern Jury Instruction regarding self-defense with one similarly worded but organized in a slightly different fashion. The trial court rejected this request, again stating that it found the pattern instruction to be a correct and complete statement of the applicable law. This issue was also raised in Slimick. As described in the Slimick opinion, the jury instruction requested by defense counsel "essentially consisted [of] separating the 'no duty to retreat' concept and placing it in a sentence after the self-defense instruction." Slimick, 2015 WL 9244888, at *17. In rejecting this argument, the Slimick panel held that the instructions used by the trial court, "while not perhaps a model of clarity, adequately set forth the applicable law and the issues of fact which the jury had to determine." Id. at *18. We agree and adopt the reasoning of the Slimick opinion here. As such, we conclude that the trial court did not err in denying the Defendant's requested alteration to the pattern jury instruction on self-defense.

## D. Shifting the Burden of Proof

The Defendant requested that the prefatory phrase, "[i]f evidence has been introduced supporting self-defense," be removed from the trial court's self-defense instruction. The trial court rejected the Defendant's request and instructed the jury as follows:

> If evidence is introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense before the defendant can be found guilty of any offense.
>
> If from all the facts and circumstances you find the defendant acted in self-defense, or if you have a reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.

On appeal, the Defendant argues that the prefatory phrase improperly shifted the burden to "the [D]efendant to 'raise' the defense when instead this was an issue of law for the trial court and not the jury."

The Slimick panel noted that "[t]he initial determination regarding whether evidence fairly raising self-defense has been introduced is one" for the trial court. 2015 WL 9244888, at *16. As such, the Slimick panel concluded that "the trial court should not have included" the prefatory phrase in the jury instructions "because [it] was not a

-25-

proper determination for the jury but for the court itself." Id. However, the Slimick panel held that this error was ultimately harmless in light of the Defendant's theory of the case and the arguments of the parties because "there [was] simply no possibility of jury confusion regarding the fact that evidence of self-defense had been introduced and that the jury was required to consider the issue." Id. at *17.

While not addressed by either of the parties, we find this court's opinion in State v. Leath to be instructive on the issue. 461 S.W.3d 73, 105-06 (Tenn. Crim. App. 2013). In Leath, the Defendant argued that the jury instruction for the defense of alibi improperly shifted the burden of proof from the State to the Defendant because the instruction stated as follows, "An alibi is defined as evidence which if believed would establish that the defendant was not present at the scene of the alleged crime . . . ." Id. at 105 (quoting Christian v. State, 555 S.W.2d 863, 866 (Tenn. 1977)). This court concluded that the words "if believed" did not shift the burden of proof because "the second part [of the instruction made] clear that the burden of proof was on the State to prove beyond a reasonable doubt that the defendant was present at the commission of the offense" and that should the State fail "to meet its burden, then the jury should acquit the defendant." Id. at 106.

The defense of alibi "is somewhat similar to self-defense." 11 David Louis Raybin, Tennessee Practice: Criminal Practice and Procedure § 28:8 (Burden of Persuasion) (2015). While worded differently, we find the phrase "if believed" from the alibi jury instruction to be similar to the prefatory phrase used here. As such, we conclude that the prefatory phrase did not shift the burden of proof from the State to the Defendant. Neither phrase explicitly stated who was to introduce the evidence of alibi or self-defense. Furthermore, like the jury instruction at issue in Leath, the self-defense jury instruction given here made clear that the State had the burden of disproving the Defendant's claim of self-defense and that the jury should acquit the Defendant if he acted in self-defense or there was reasonable doubt as to whether he acted in self-defense. Furthermore, any error in including the prefatory phase would have been ultimately harmless because, like in Slimick, it was clear throughout the trial proceedings that evidence of self-defense had been raised and that the issue was squarely before the jury. Accordingly, we conclude that this issue as presented is without merit.

### E. State's Burden of Proof Regarding the Lesser-Included Offenses

The Defendant also argues that the trial court "failed to instruct the State's burden as to lesser-included offenses" by instructing the jury that the State had to prove beyond a reasonable doubt "all of the elements of the crime charged." The Defendant requested that the trial court add "or any lesser-included offenses" to the end of that instruction. The Defendant argues without such language "we cannot be sure that the jury did not use

an improper standard in finding an absence of 'passion'" regarding the difference between second degree murder and voluntary manslaughter.

Again, this issue was raised in Slimick. Noting that the jury instructions "informed the jury that it must consider the lesser-included offenses if it chose to acquit on the greater offense, that it must consider them in sequence," and that the instruction for each lesser-included offense provided that the State bore the burden of proving the essential elements beyond a reasonable doubt, the Slimick panel concluded that "the instructions, read as a whole, were not deficient or likely to mislead the jury" with regard to this issue. Slimick, 2015 WL 9244888, at *22. The same is true here, and we adopt the Slimick opinion's reasoning in rejecting the Defendant's argument. Accordingly, we conclude that the trial court did not err in rejecting the Defendant's request for a special instruction on the State's burden of proof regarding the lesser-included offenses.

*IV. Sentencing*

The Defendant contends that the trial court abused its discretion by imposing a twenty-year sentence. The Defendant argues that "a sentence at the lowest end of the [applicable] range would have been more appropriate" because his "actions were, at worst, borderline with [v]oluntary [m]anslaughter, . . . if not [s]elf-[d]efense." The Defendant further argues that a lower sentence was warranted given his minimal history of criminal conduct, the fact that measures less restrictive than confinement had not been applied unsuccessfully to him, and that he had "a great potential for rehabilitation" exhibited by the numerous letters written on his behalf. Additionally, the Defendant notes that "[t]here was also ample proof of several mitigating factors." The State responds that the trial court did not abuse its discretion when it imposed a mid-range sentence on the Defendant.

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W.3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d).

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in

relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Sentences involving incarceration "should be based on the following considerations":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of term to be imposed." Tenn. Code Ann. § 40-35-103(5).

As a Range I, standard offender convicted of a Class A felony, the applicable sentencing range was fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). In determining its sentence, the trial court considered the purposes and principles of the Sentencing Reform Act, examined the proposed enhancement and mitigating factors, and weighed the applicable enhancement factors against the applicable mitigating factors. While it is true that the Defendant's prior criminal history was minimal, that was considered by the trial court along with the numerous letters written on the Defendant's behalf.

Additionally, the Defendant's argument on appeal does not address the fact that the trial court gave great weight to the fact that the Defendant employed a firearm during the commission of the offense and some weight to the fact that the Defendant had no hesitation about committing the offense when the risk to human life was high. Furthermore, the trial court rejected the application of the mitigating factors referred to in the Defendant's appellate brief. The Defendant has not overcome the presumption of reasonableness granted to the in-range sentence imposed by the trial court. Accordingly, we conclude that the trial court did not abuse its discretion by imposing a mid-range, twenty-year sentence.

*V. Cumulative Error*

The Defendant contends that, even if no single error requires a new trial, the cumulative effect of multiple errors mandates such action. The Defendant argues that there were several errors during the course of his trial that deprived him "of a fair trial." The State responds that there can be no cumulative error because the Defendant "has failed to establish that there was [a] single error, much less multiple ones."

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare." Id. Having discerned no error in the trial proceedings, there can be no cumulative error. Accordingly, we conclude that this issue is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-29-