STATE of Tennessee, Appellee,

v.

**George YOUNG, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Oct. 8, 1982.

Permission to Appeal Denied by Supreme Court on Dec. 13, 1982.

Gary W. Dodson, Sparta, for appellant.

William M. Leech, Jr., Atty. Gen., David M. Himmelreich, Asst. Atty. Gen., Nashville, John M. Roberts, Dist. Atty. Gen., Alan E. Foster, Asst. Dist. Atty., Livingston, for appellee.

OPINION

TATUM, Judge.

The defendant, George Young, was convicted of second degree murder and sentenced to serve not less than 40 years nor more than 40 years in the State penitentiary. In three issues, the defendant attacks the sufficiency of the evidence and says that the trial judge abused his discretion by allowing a photograph of the deceased's body to be admitted into evidence. We find no error and affirm the judgment of conviction.

We first consider the issues attacking the sufficiency of the evidence. This case grew out of the stabbing death of Johnny Ledford on the night of December 16, 1980. The victim and Ernest Christian had been driving around and drinking beer on the

night of December 16, 1980, in the victim's automobile. At approximately 9:30 or 10:00 o'clock, the victim drove by the residence of Ms. Pauline Bruce who lived at the Mt. Vernon subdivision in White County. Ms. Bruce had three daughters and a son, Steve Bruce, who were at home. Each of the daughters had dates who were also at the Bruce residence. The defendant had a date with Donna Bruce (Flatt) and his half-brother, Dale McClusky, had a date with Pam Bruce. Another daughter, Melissa Bruce, had a date with Gary Whittaker.

There was considerable conflict in the evidence but it fairly reflects that when the victim and Christian stopped their car in front of the Bruce residence, Steve Bruce, who was a friend of the victim, came outside to the car and talked with him. A few minutes later, the defendant and Donna Bruce came outside and conversed with the victim. The evidence conflicts as to whether the conversation between the defendant and the victim was argumentative or "regular talk." There is testimony that after the defendant and Donna went back into the house, the victim sent the defendant a message through Steve, to the effect that if the defendant wanted to fight, he (the victim) would be waiting at the end of the road. Steve Bruce also testified that the victim showed him a pocket knife and said that he could have cut the defendant. He also said that the defendant was not good enough for Donna.

After leaving the Bruce residence, the victim drove to the end of the road and got a lug wrench from the back of the car which he handed to Christian. Christian put it under the front seat. The victim then drove back past the Bruce residence. He turned the car around and again passed the Bruce residence, stopping at the end of the road. There is evidence, pro and con, that the victim screamed abusive or challenging language at the defendant when he passed the Bruce residence. The victim again stopped his car at the end of the road after pulling over sufficiently to enable traffic to pass. After the victim and Christian had stopped, the defendant and Dale McClusky drove past the victim's car and stopped their car directly in front of it. The defendant and McClusky could have conveniently gone another way to leave the subdivision. The defendant had received the message that the victim would be waiting at the "end of the road."

The victim remained seated under the steering wheel of his car and the defendant left the McClusky car, coming up to the window of the victim's car. The evidence is overwhelming that the victim did not leave his car but that the defendant attempted to pull him out of the car. The defendant shook the victim, kicked him, and struck him. During the altercation, the victim repeatedly told the defendant that "he didn't want no trouble." During the episode, members of the Bruce family came to the scene and most of those who testified saw a knife in the defendant's right hand. The defendant's girlfriend testified that she saw a knife in the victim's hand but none of the other witnesses saw the victim with a knife. None saw the victim reach for the lug wrench. All of the witnesses denied seeing the defendant stab the victim.

Following this altercation, the victim started the motor of his car and drove away. When he had driven a very short distance, he laid his head back against the seat of the automobile and his arm fell from the steering wheel. The car left the road and struck a house with great force. An open pocketknife was found on the front seat of the victim's car. Christian testified that the victim had been using the knife earlier while doing some repair work.

The victim was taken to the hospital soon after he drove into the house. It was stipulated that a physician who examined the victim's body at 8:00 the next morning determined his cause of death to be "two stab wounds to the left side, one at chest level, and the other slightly below, and that the upper wound was the cause of death." The physician also determined that the victim's blood alcohol content was .17%.

The defendant went to the jail the same night where he was interviewed after being given Miranda warnings. The defendant

admitted an argument with the victim but denied "sticking him." The defendant also denied that he had a knife and denied that he had engaged in physical combat with the victim. There was testimony that the defendant "had been drinking" when he came to the jail. There was other testimony that the defendant had nothing to drink at the Bruce residence.

A few days later, the defendant asked to see the sheriff. He told the sheriff that the victim had been to the Bruce residence cursing and abusing them. The defendant said that when he left the Bruce residence and passed the victim's car parked down the road, he stopped. He told the sheriff that the victim had a knife in his hand on the steering wheel of the car and threatened to use the knife. He said that was when he stabbed the victim. He told the sheriff that he had thrown his knife into a vacant lot across the street from the Bruce residence. The sheriff made a search of the vacant lot and found a butcherknife.

The defendant did not testify. He introduced three members of the Bruce family who testified as to their version of the episode. The proof by the defense was not altogether contradictory to the State's proof; much of it was corroborative.

The defendant insists that this judgment of conviction must be reversed because he was acting in self defense; that he "was simply doing what he had to do as it appeared to him in order to protect his life." Tennessee law on this subject is discussed in *State v. Kennamore*, 604 S.W.2d 856 (Tenn. 1980), wherein the Supreme Court said:

> "The law of excusable homicide requires that the defendant must have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat, if, and, to the extent, that it can be done in safety."

■ The defendant's conduct was directly opposite to that required by law. Conceding that the victim challenged to meet the defendant "at the end of the road" for an altercation, after preparing himself with a knife and lug wrench, these facts will not justify the homicide. Instead of retreating, the defendant went to meet the victim when he could have left the Bruce residence by another route or he could have simply driven on past the victim's parked vehicle. Instead, he went to the place where the victim was waiting, got out of the car, and approached the victim. The defendant opened the victim's car door, grabbed the victim by his hair or shoulders, and shook him. The defendant kicked the victim and attempted to pull him from the car; all this occurring while the victim said that he wanted no trouble. Having previously armed himself with a large kitchen knife, the defendant stabbed the victim twice. While we have not attempted to detail all of the evidence, pro and con, there was substantial evidence that the defendant was the aggressor at the time of and immediately before the slaying.

■ It is axiomatic that threats of injury or death will not justify taking the life of the person making them, when he is doing nothing to put such threats into execution. *Sherman v. State*, 125 Tenn. 19, 140 S.W. 209 (Tenn.1911); *Barnards v. State*, 88 Tenn. 183, 12 S.W. 431 (Tenn.1889); *Rippy v. State*, 39 Tenn. 217 (1858). The victim did nothing at the Bruce residence or while driving by the Bruce residence to execute any threat. The evidence is substantial that he committed no overt act of aggression after the defendant came to his automobile at the "end of the road." The defendant had an opportunity to decline combat; instead he stopped at the point where the victim was waiting, approached the victim's car, and committed the overt acts described. In 40 C.J.S., *Homicide*, § 133, p. 1020 (1944), it is correctly stated:

> "Where after the original difficulty had ceased or deceased had abandoned it, or accused had an opportunity of declining further combat, and he instead continued the struggle or renewed the combat, he became the aggressor, irrespective of whether he was at fault in bringing on the original difficulty, and is not justified in claiming self defense."

We find overwhelming evidence to support the jury's verdict in finding that the defendant did not act in self defense and we overrule this issue.

■ The defendant makes further issue that there was no evidence of malice at the time of the killing; hence, the evidence does not support the conviction for second degree murder. We also disagree with this contention. The acts committed by the defendant above described, including the use of the deadly weapon, supported the finding by the jury that the element of malice was present. See *Wilson v. State,* 574 S.W.2d 52 (Tenn.Cr.App.1978) and the cases therein cited. The evidence meets the standard required by Rule 13(e), T.R.A.P.

■ Finally, the defendant insists that a photograph showing the location of the stab wounds on the defendant's body should not have been admitted into evidence since he had stipulated to the testimony of Dr. Buchanon, as above quoted. The defendant cites *State v. Banks,* 564 S.W.2d 947 (Tenn. 1978) for the proposition that gruesome photographs should not be admitted if the prejudicial effect of admitting them outweighs any probative value.

The *Banks* court observed that the Supreme Court has followed a policy of liberality in the admission of evidence and that the admission of photographs is left to the sound discretion of the trial judge. The photograph admitted depicts the torso of the deceased showing two wounds, one above the other, in the left side. The wounds had been cleaned before the photograph was taken. Admittedly, the photograph is unpleasant, but in comparison with the photograph described in the *Banks* case, it is not gruesome. More shocking pictures may be seen any day on television or in motion pictures.

In view of the defendant's theory of the case, the photograph was very probative to show the exact location of the victim's wounds to refute the theory of self defense. For example, the photograph was probative to refute defense witness, Donna Bruce (Flatt's) testimony that the victim was sitting under the steering wheel of his car, turned to the left, and facing the car door, in repeated attempts to exit the car. The location of the wounds is inconsistent with this testimony. We do not find that the trial judge abused his discretion in admitting the photograph.

The judgment below is affirmed.

O'BRIEN and DAUGHTREY, JJ., concur.