IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 16, 2025

**STATE OF TENNESSEE v. LUCIAN A. CLEMMONS**

**Appeal from the Criminal Court for Wilson County**
**No. 21-CR-192      Brody N. Kane, Judge**

———————————————

**No. M2024-00520-CCA-R3-CD**

———————————————

The Defendant, Lucian A. Clemmons, appeals from his convictions for first degree premeditated murder, aggravated assault, and reckless endangerment with a deadly weapon. On appeal, he asserts constitutional and evidentiary claims related to the trial court's exclusion of prior statements he made to the lead detective following his arrest. Additionally, as to the murder conviction, the Defendant contends that it was error for the trial court to refuse to instruct the jury on self-defense and that the evidence was insufficient to support the jury's verdict because the State failed to establish premeditation beyond a reasonable doubt. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Lucas B. Willoughby, Nashville, Tennessee, for the appellant, Lucian A. Clemmons.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Jason L. Lawson, District Attorney General; and Tammy H. Meade and Laura E. Bush, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I.      FACTUAL AND PROCEDURAL HISTORY

On March 17, 2021, the Defendant shot the victim, James Ray Huddleston, multiple times within a crowded residence situated outside the city limits of Mt. Juliet, Tennessee. For these actions, a Wilson County grand jury indicted the Defendant on May 12, 2021,

charging him with first degree premeditated murder for the death of the victim, as well as aggravated assault and reckless endangerment with a deadly weapon for his conduct toward other individuals in and around the residence at the time of the shooting. *See* Tenn. Code Ann. §§ 39-13-102, -103, -202. The Defendant proceeded to a three-day jury trial beginning on March 6, 2023.

At trial, the State presented proof that the Defendant lived with his extended family at the residence where the shooting took place. Numerous other friends and relatives lived at this residence—or were staying or visiting there temporarily—at the time of the shooting, including the victim, the Defendant, and three of the Defendant's cousins: Sabrina Stegall, Emanuel Campbell, and Derrick Dobson. Ms. Stegall, Mr. Campbell, and Mr. Dobson testified at the Defendant's trial regarding what they observed on the day of the shooting.

On the afternoon of March 17, 2021, Emanuel Campbell was walking his dog outside the residence, and he saw the Defendant and the victim arrive at the residence in separate vehicles. Mr. Campbell was some distance away from the two men when they exited their respective vehicles, and he could not hear what they were saying, but he believed that they were having "a disagreement" based on their body language. At one point, the two men were "face to face," and the victim, who had been carrying groceries, "drop[ped] his bags . . . . insinuating that there was going to be . . . a fight or something." However, shortly after this, the victim "picked his bags up and just walked off" into the house with the groceries. Mr. Campbell observed the victim "walking, like, casual, like, everything was all good. Like, nothing was going to happen."

Mr. Campbell recalled that, as he looked back toward the Defendant, "I just seen [the Defendant] sitting there, I guess he was just thinking. I don't know. I don't know what he was doing. Before you know it, he just made his move towards the house." The Defendant approached the house "in a rush" and "started reaching" for his gun. Mr. Campbell heard multiple gunshots "ring[] out" after the Defendant entered the residence, but he did not recall how many. As Mr. Campbell began to approach the residence, Mr. Dobson exited the residence followed by the Defendant. The Defendant looked at Mr. Campbell and Mr. Dobson, pointed his gun at both of them, and asked "[Y]ou want some, too?" Eventually, the Defendant lowered the gun and said, "He threatened me, you know what I'm saying. He said he was going to kill me." Mr. Campell told the Defendant to "get out of there[,]" but the Defendant was already heading toward his truck.

Mr. Campbell entered the residence, and he saw his mother, Ms. Stegall, "in the hallway with [the victim] . . . where he was laid out by the door" to her bedroom. As he

was entering the residence, Mr. Campbell "almost tripped on" three shell casings that were lying on the floor inside, and he picked them up and placed them on a nearby counter. He confirmed that when law enforcement arrived on the scene, he "immediately" told them that he had moved the shell casings and estimated the positions of where he had picked them up from the floor.

On cross-examination, Mr. Campbell reiterated that he could not hear anything being said between the Defendant and the victim outside the house. However, when asked to recount the circumstances "before they start[ed] fighting," Mr. Campbell interjected to say, "There was no fight." During further questioning, he persisted, "They [weren't] going at it. I could just tell it[ was] a disagreement." However, he agreed that he thought "they were about to go to blows." Mr. Campbell also confirmed that the Defendant already had the gun on his person when he went inside the residence and that he did not return to his truck to retrieve it after the initial disagreement. He agreed that he did not see the shooting, and he did not have any knowledge of what occurred between the Defendant and the victim once they were inside the residence.

Derrick Dobson was at the residence spending time with his aunt, Ms. Stegall, and other relatives on the day of the shooting. "[A]t some point," Mr. Dobson walked over to the doorway of the residence. At that time, Ms. Stegall's stepfather and her ten-year-old godson were on the couch in the living room. The minor child was asleep under a blanket in the corner of the couch. When Mr. Dobson got to the doorway and looked out, he saw the Defendant and the victim interacting some distance away from the house. He could not hear what the two men were saying, but he observed them interacting some distance away from the house:

> They were arguing, and they got chest to chest. And then, they were still arguing back and forth and then [the victim] had just ended up picking up the groceries, walking away from the argument. And he was going up the steps [into the residence,] and they were still arguing. And then, that's when [the Defendant] had pulled out his gun. And [the victim] had told me, excuse me, and [the Defendant] told me to move out of the way, because I was standing in the door frame.
>
> . . . .
>
> So, [the victim] started walking, kind of faster, like a mad walk. And then, he was going up the steps. And then, yes, [the Defendant] followed after him. And then, as [the victim] was going up the steps and [the victim]

hit the top of the porch, that's when [the Defendant] was coming behind him and pulled out the gun. And I had moved out of the way for [the victim] and [the Defendant] had came to the doorway and told me to move out of the way. And then, that's when he had shot [the victim] in the back and I had turned around and seen.

According to Mr. Dobson, after the victim walked away from the initial argument outside, the only time the victim turned back and looked at the Defendant was after "the first time he got shot." Mr. Dobson described the victim as being wide-eyed, "just in shock." At that point, the victim "turned around and . . . ran for his life . . . down the hallway." Mr. Dobson recalled that the victim "ended up [at] the doorway of [Ms. Stegall's] bedroom and he fell in the door."

In the moments following the first shot, Mr. Dobson went outside "because [he] was scared, and [he] didn't know what to do." He remembered hearing "three to four" gunshots, but he only saw the first one. Shortly thereafter, the Defendant came outside and addressed Mr. Dobson and Mr. Campbell. The Defendant said, "I told y'all to stop playing with me," pointed the gun at Mr. Dobson and Mr. Campbell, and asked, "Who else wants some?" Mr. Dobson "felt threatened, and [he] felt like if [he] would have said anything wrong, it could have been [his] life, too." The Defendant eventually went to his truck and drove away, and Mr. Dobson remained outside until law enforcement arrived.

Mr. Dobson also asserted that the victim had groceries in his hands at the time he was shot, and the victim did not possess or own a gun: "There [were] no other guns in that house. [The Defendant] was the only person in that house that I know had a gun." In photographs of the scene, Mr. Dobson identified the red couch where the minor child had been asleep at the time of the shooting and the blanket that had covered him. Bullet holes were visible in the arm of the couch near where the child's head had been, as well as through the fabric of the blanket.

On cross-examination, defense counsel asked whether the Defendant stopped firing after he hit the victim and if Mr. Dobson knew whether the Defendant hit the victim on the first shot or the last shot. Mr. Dobson responded that he knew "for sure" the Defendant's first shot hit the victim, and he heard three to four shots, but he "couldn't hear anymore, because [his] ears were ringing" after the first shot. Mr. Dobson disagreed that the Defendant stopped firing after hitting the victim, and he believed the Defendant only stopped firing "[a]fter his gun was almost empty."

- 4 -

Sabrina Stegall, the Defendant's cousin and the victim's girlfriend, had just worked an overnight shift and was asleep in her bedroom at the time of the shooting. She recalled being awoken by the sound of "gunshots and running through the house," but she heard no voices. Shortly thereafter, the victim fell facedown through her bedroom door. Although he did not have anything in his hands, she observed groceries dropped just outside the doorway. Ms. Stegall then heard the Defendant approaching down the hallway, "And he said, I told them folks about messing with me." Ms. Stegall told the Defendant to "get out," and he left the residence. Ms. Stegall saw that the victim had been "shot in the back" and called 911. After picking up the groceries in the hallway, she remained with the victim until the ambulance and law enforcement arrived.

Law enforcement personnel who responded to the scene were unable to find a pulse on the victim, and he was soon after removed from the scene by emergency medical services personnel and pronounced deceased. However, law enforcement personnel photographed the scene while the victim was still present and put out an alert on the Defendant's vehicle. Wilson County Sheriff's Office Detective James Smith, who was traveling in an unmarked vehicle, encountered the Defendant's truck, and he instructed another officer in a marked cruiser to effectuate a traffic stop. The Defendant was cooperative during the stop and was placed under arrest. Det. Smith, who served as the lead investigator in this case, oversaw the provision of search warrants for the Defendant's truck and the residence where the shooting occurred. After search warrants had been obtained, law enforcement personnel attempted to recover projectiles from the walls of the residence near the bedroom and the couch and collected the shell casings from the scene for analysis. The subsequent search of the Defendant's truck yielded discovery of a loaded firearm in the glove compartment that had five rounds missing from the magazine. Laboratory testing conducted at the Tennessee Bureau of Investigation confirmed that the shell casings recovered from the scene had been fired from this weapon. Law enforcement personnel also examined the Defendant's and the victim's cell phones but did not find anything "really relevant" to the investigation contained on either device.

During a jury-out hearing, defense counsel questioned Det. Smith as part of a proffer regarding statements the Defendant had made to him surrounding his arrest. Det. Smith recalled that, during the traffic stop, the Defendant mentioned "that there were documents in the backseat" of his truck, but he refused to provide consent for officers to search his vehicle. When Det. Smith later interviewed the Defendant at the Wilson County Sheriff's Office, the Defendant "stated that there was evidence to support that he felt threatened in the back of his vehicle." After obtaining a search warrant for the Defendant's vehicle, Det. Smith "personally went through all of the documentation that [the Defendant] had back there," but he "didn't find anything that corroborated [the Defendant's] statement." Det.

Smith persisted that, after having gone through this documentation, as well as the Defendant's and the victim's phones, "there was nothing in anything that [the Defendant] had stated previously to support that there were any threats." Det. Smith acknowledged that he did not investigate the Defendant's claims that the victim was involved in drug use or had any gang affiliation. However, he also asserted that any such evidence would have been passed on to the narcotics division, but he "didn't have any evidence to support any narcotics [allegations]."

At the conclusion of this proffer, the State argued against the admission of the Defendant's statements, asserting that "this is exactly what we've already ruled on."

> And these questions, with all due respect to [defense counsel], I understand what he does and doesn't have to work with, but these, all this is doing is him questioning on the statement that's already been excluded and we're not entering. So, we don't think these questions are appropriate. You can certainly say, Did you look through everything in the truck? But to ask about his defense of he threatened me, Judge, that's already been excluded and we're not entering it.

Although defense counsel had not yet made any argument during this portion of the proceeding, the trial court then asked, "Do you want to be heard again?" Defense counsel responded, "I would just renew what I, I previously said." Following some discussions about the particular statements and line of questioning that could be pursued without objection, the trial court stated that it would "keep the ruling" in place, and it noted that it would "follow that *Hall* case" by doing so. When the trial resumed in the presence of the jury, none of the Defendant's statements to Det. Smith were introduced, nor was Det. Smith examined on those points.

Dr. Thomas Deering, an expert in forensic pathology, conducted the victim's autopsy. He observed two perforating gunshot wounds, one through the back of the victim's forearm and one through his torso, which entered through the victim's back and exited through his chest. The bullet that entered the victim's torso caused catastrophic damage to his internal organs. Dr. Deering confirmed the victim had marijuana and cocaine in his system at the time of his death.

At the conclusion of the proof, the parties and the trial court engaged in a final conference regarding the jury instructions in this case. During an earlier break in the trial proceedings, the Defendant had requested a self-defense instruction, which the State opposed. After consideration, the trial court initially agreed to give the instruction "out of

an abundance of caution," and it stated that it would "err on the side of the [D]efendant, given the nature of the charge." However, during the final conference, and after reviewing *State v. Benson*, 600 S.W.3d 896 (Tenn. 2020), the trial court declined to instruct the jury on self-defense:

> It says [in *Benson*], [n]othing in the record showed that the victim used or attempted to use deadly force against the defendant or threatened to cause serious bodily injury to the defendant. That's what we have in this case. There was a threat. I mean, it could have been, I'm going to bite your ear. I don't know what it could be, but, I mean, based on this holding, I'm going to reverse my decision on that.

Following deliberations, the jury found the Defendant guilty as charged, and the trial court imposed an effective sentence of life imprisonment. This timely appeal followed the denial of the Defendant's motion for new trial.

## II.    ANALYSIS

On appeal, the Defendant challenges the trial court's rulings excluding his prior statements to law enforcement. Additionally, the Defendant challenges his first degree premeditated murder conviction on the basis that the trial court should have instructed the jury on self-defense, and the evidence was insufficient to support the jury's finding of premeditation.

### A.    Exclusion of Defendant's Prior Statements

The Defendant argues that he was prevented from putting forth a "full and complete" defense by the exclusion of his prior statements to law enforcement and the related cross-examination he sought at trial based upon them. The State responds that the Defendant has waived review of these claims for failure to compile an adequate record for effective appellate review. We agree with the State.

To effectuate appellate review, the appealing party "has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal." *State v. Stack*, 682 S.W.3d 866, 876 (Tenn. Crim. App. 2023) (citing *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983)) (discussing how appellate review was precluded by the defendant's failure to include in the appellate record the guilty plea hearing transcript that provided the factual circumstances of the offense and the trial court's reasoning for its sentencing determinations); *see also* Tenn. R. App. P. 24(b) ("[T]he

- 7 -

appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue . . . [and] must conclusively presume that the ruling of the trial court was correct in all particulars." *Stack*, 682 S.W.3d at 876 (citing *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987)).

From the context of the parties' exchange during the jury-out hearing that occurred concerning the Defendant's statements to Det. Smith, it appears as though a pretrial hearing took place regarding their admission. During the exchange, the parties' referenced a prior "ruling" the statements at issue had "already been excluded," defense counsel "renew[ed]" his prior argument, and the trial court's decision to uphold its prior ruling ultimately relied on a precedential case that neither party mentioned during this portion of the proceedings. The particulars of the hearing, such as the law relied upon and the arguments made by the Defendant in favor of admission, are not apparent from the trial transcript. As the State noted in its brief, the record on appeal does not include a motion, transcript, or order related to this previous hearing. As such, we are unable to review the parties' arguments as to this issue, any evidence presented, or the trial court's reasoning for its ruling. Further, the Defendant did not file a reply brief to address this deficiency or ask to supplement the record. From the record before us, we can only determine that the trial court excluded the statements the Defendant made to Det. Smith, standing by its previous ruling. We are thus precluded from considering this issue and must presume that the trial court ruled correctly at the prior proceeding. *See Stack*, 682 S.W.3d at 876 (citing *Miller*, 737 S.W.2d at 558).

## B. Self-Defense Instruction

The Defendant next claims that the trial court should have instructed the jury on self-defense based on his contention that the victim threatened to kill him. The State responds that self-defense was not fairly raised by the proof. We agree with the State.

"If proven to the satisfaction of the jury, self-defense is a complete defense to crimes of violence." *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993) (first citing *Arterburn v. State*, 391 S.W.2d 648 (1965); and then citing *Grainger v. State*, 13 Tenn. (5 Yer.) 459, 462 (1830)). Tennessee Code Annotated section 39-11-611(b), which governs claims of self-defense, provided in relevant part at the time of the Defendant's offenses as follows:

(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (Supp. 2017). When self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. *See* Tenn. Code Ann. § 39-11-201(a)(3); *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020).

A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). To evaluate claims of self-defense, the jury must decide "whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995). Reliance on self-defense is not limited to the exact moment of the defendant's use of force, but it may be considered in connection with the entirety of the events leading to the offense. *Ivy*, 868 S.W.2d at 727.

However, the issue of whether a defendant acted in self-defense may not be submitted to the jury unless it is fairly raised by the proof. *See* Tenn. Code Ann. § 39-11-203(c). To make this determination, the trial court must consider the evidence introduced at trial in the light most favorable to the defendant and draw all reasonable inferences in favor of the defendant. *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013). When this

consideration does not indicate "that the defendant reasonably feared imminent death or serious bodily injury [so as] to justify his use of deadly force," the self-defense instruction should not be given. *Benson*, 600 S.W.3d at 907. More than the "slightest of evidence" is needed to fairly raise self-defense. *Id.* at 905. Additionally, failure to give such an instruction when the defense has been fairly raised by the proof may be "harmless beyond a reasonable doubt [if] no reasonable jury would have accepted the defendant's self-defense theory." *State v. Perrier*, 536 S.W.3d 388, 404-05 (Tenn. 2017) (footnote omitted).

The evidence adduced at trial established that, following a verbal argument, the Defendant pulled out a gun, followed the victim into an occupied residence, and shot at the victim multiple times, hitting him twice. The medical examiner confirmed that the shots entered the back of the victim's body, and multiple witnesses observed that the victim had walked away from the argument and was carrying groceries at the time. Mr. Dobson testified that the victim had his back to the Defendant when he was hit by the first shot, and he began running away from the Defendant when the subsequent shots were fired. After the shooting, the Defendant asserted that the victim had threatened to kill him.

Drawing all reasonable inferences in favor of the Defendant, we nevertheless conclude that the Defendant's belief that he was in "imminent" danger of death or serious bodily was not reasonable. *Benson*, 600 S.W.3d at 907 (holding that the trial court properly refused to instruct the jury on self-defense when the defendant shot the unarmed victim multiple times after she punched him in the nose). Following the verbal altercation wherein the victim threatened to kill the Defendant, the victim did not pose an immediate threat: he walked away from the Defendant at a "casual" pace—while unarmed and carrying groceries—into a residence filled with the Defendant's relatives, during which time the Defendant remained outside—and armed—near his truck. *See State v. Young*, 645 S.W.2d 255, 257 (Tenn. Crim. App. 1982) ("[T]hreats of injury or death will not justify taking the life of the person making them, when he is doing nothing to put such threats into execution."); *cf. Bult*, 989 S.W.2d at 733 (holding that the proof did not fairly raise the defense of another because the defendant's belief that his daughter, who was crying as she was removed from his presence, was in imminent danger of death or serious bodily injury was not reasonable); *Hawkins*, 406 S.W.3d at 129-30 (noting that, when the evidence did not fairly raise the possibility that the defendant shot the victim because it was "immediately necessary" in defense of another, the instruction should not be given).

A defendant who merely asserts to witnesses in the aftermath of a violent offense that he or she acted in self-defense, unsupported by any other proof of the actual existence of the need for self-defense, has not presented "more than the 'slightest of evidence'" on

- 10 -

the issue, and such an assertion is insufficient to justify the inclusion of a self-defense instruction. *See Benson* 600 S.W.3d at 905; *see also Bult*, 989 S.W.2d at 732 ("[T]he mere fact that the defendant believes that his conduct is justified [does] not suffice to justify his conduct."). The Defendant is not entitled to relief.

## C.      Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence supporting the jury's finding of premeditation. The State argues there is ample evidence in the record on this point. We agree with the State.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id*. § -11-106(a)(21).

[P]remeditation is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id*. § 39-13-202(d).[1]

"Premeditation may be inferred from the manner and circumstances of the killing." *Finch v. State*, 226 S.W.3d 307, 318 (Tenn. 2007) (citing *Bland*, 958 S.W.2d at 660). Several circumstances may bear on the existence of premeditation, including but not limited to:

(1) The use of a deadly weapon on an unarmed victim;

(2) The particular cruelty of the killing;

(3) Threats or declarations of intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

---

[1] This subsection was redesignated in 2021 and is now located at Tennessee Code Annotated section 39-13-202(e). *See* 2021 Tenn. Pub. Acts, ch. 394, § 1.

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*State v. Reynolds*, 635 S.W.3d 893, 916-17 (Tenn. 2021). The list of specific circumstances developed through case decisions is not exhaustive, however, and the trier of fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citation modified).

The instant case presented numerous circumstances from which the jury could have reasonably inferred premeditation on the part of the Defendant. The Defendant employed a firearm against the unarmed victim, who did not own a gun and was carrying groceries at the time that he was shot. *See Reynolds*, 635 S.W.3d at 916. The Defendant shot at the victim multiple times, inflicting two gunshot wounds. *See id.* at 917. Two witnesses testified that the victim had walked away from the argument, from which a reasonable jury could infer a "lack of provocation on the part of the victim." *Id.* This, coupled with testimony that the victim ran away from the Defendant after the first shot was fired, also constituted evidence that the victim was both retreating and attempting to escape after being shot from behind at the time that he was killed. *Id.* at 917-18. The Defendant made no attempt to render aid to the victim but instead left the residence. *See id.*

Additionally, the jury heard testimony that the Defendant remained outside after the victim walked away from the verbal argument, during which time the Defendant appeared to be "just thinking." From this, a reasonable juror could have inferred that the Defendant spent this time engaging in reflection and judgment, and he then acted on that reflection and judgment when he drew his gun and pursued the retreating victim into the residence where he shot and killed him. Viewed in the light most favorable to the State, the evidence established that the Defendant acted with premeditation beyond a reasonable doubt. *See State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017) (affirming the jury's finding of premeditation when the defendant fired a deadly weapon on multiple unarmed victims); *State v. Wooten*, No. W2022-00315-CCA-R3-CD, 2022 WL 16919957, at *7 (Tenn. Crim. App. Nov. 14, 2022) (noting that the circumstances of the killing supported the jury's finding of premeditation when the defendant shot an unarmed victim in the back); *State v. Walls*, No. W2022-01379-CCA-R3-CD, 2024 WL 1796968, at *4 (Tenn. Crim. App. Apr. 25, 2024) (concluding that the proof was legally sufficient to support premeditation when

the defendants shot the victims multiple times from behind before leaving the scene without rendering aid), *perm. app. denied* (Tenn. Sep. 12, 2024*)*.  The Defendant is not entitled to relief.

### III.    CONCLUSION

Based upon the foregoing and consideration of the record as a whole, we affirm the judgments of the trial court.

 s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE